AMERICAN TERRAZZO STRIP COMPANY, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 4033–65, 3720–66. Filed August 9, 1971.

*Harvey R. Kitay* and *Arthur H. Goodman,* for the petitioner.
*Stephen M. Miller,* for the respondent.

FEATHERSTON, *Judge:* Respondent determined the following deficiencies in petitioner's income tax:

| Docket No. | Year ending June 30— | Deficiency |
|---|---|---|
| 4033–65 | 1959 | $109, 106. 71 |
| | 1960 | 123, 279. 15 |
| | 1961 | 66, 946. 10 |
| 3720–66 | 1962 | 138, 223. 29 |

A number of issues have been settled, and the only one for decision is whether respondent properly reallocated gross income and deductions from Caribe Metals Corp. and Caribe Metals Inc. to petitioner so as clearly to reflect the income of petitioner in accordance with section 482;[1] and, if not, what reallocation of gross income and deductions, if any, should be made.

### FINDINGS OF FACT

American Terrazzo Strip Co., Inc. (hereinafter referred to as petitioner), a corporation organized under the laws of New York, had its principal offices in Niagara Falls, N.Y., at the times it filed its petitions. Petitioner filed its income tax returns for the fiscal years ending June 30, 1959, 1960, 1961, and 1962, with the district director of internal revenue, Buffalo, N.Y.

Some of the facts have been stipulated and are incorporated herein by this reference.

Petitioner was incorporated under the laws of New York on June 30, 1949. All of its common and preferred stock was issued to Joseph Green (hereinafter Green) in exchange for various assets of a terrazzo strip business which Green had operated as a sole proprietor.

Petitioner is one of the leading producers and distributors of terrazzo strip, commanding approximately 40 percent of all of that business in the United States. Its main competitors include Manhattan Terrazzo Brass Strip Co., Inc. (hereinafter MTBS), and Rudel Floor Strip Co., Inc. (hereinafter Rudel).

Petitioner's product consists of strips of metal of various lengths, widths, and thicknesses which are used as dividers to separate blocks of concrete and are laid in various architectural designs in concrete floors. A mixture of marble chips and cement is poured between these strips, and when the mixture hardens it is ground and polished to give the effect of a terrazzo floor. The terrazzo strip serves as a guide for determining the depth and thickness of the terrazzo mixture; governs the level of the floor; and provides a line of stress along which will flow any cracks resulting from the settling of the cement.

---

[1] All section references are to the Internal Revenue Code of 1954, as in effect during the years in issue, unless otherwise noted.

This stress line eliminates the need to replace large segments when cracks develop.

One type of terrazzo strip (hereinafter standard strip or strip) manufactured by petitioner is made of either zinc or brass, and is comprised of a single strip of metal punched into a particular design. Another type of terrazzo strip, known as heavy top strip, is comprised of a base strip of metal and a heavier top section (hereinafter referred to as rod) made of either brass or zinc which is attached to the base section by a crimping operation.

In 1958, Green, for personal reasons, moved to the Virgin Islands. At this time, petitioner was in need of additional sources of processed materials, and the plant in Niagara Falls was unable to produce enough materials to meet its requirements. Although petitioner had machinery and equipment in storage in its Niagara Falls plant, a great deal of it could not be used because of limitations on available space.

In February 1958, Green organized Caribe Metals Corp. (hereinafter CMC) under the laws of the Virgin Islands to produce the needed additional processed materials.

Petitioner shipped the following machinery and equipment to CMC:

| Date shipped | Description | Value |
|---|---|---|
| 2/28/58 | Office equipment | $150 |
| 3/14/58 | 1 Press | 770 |
| 3/14/58 | 1 Milling machine | 500 |
| 3/27/58 | 1 Forklift | 1,600 |
| 6/5/58 | 1 Press | 2,494 |
| 7/24/58 | Scales | 100 |
| 8/27/58 | 2 Cases of machine tools, 1 table saw, 1 drill, 1 grinding machine. | 338 |
| 9/30/58 | 1 Drill press | 65 |
| 10/6/58 | 1 Grinding machine | 38 |
| 10/31/58 | 1 Typewriter | 225 |
| 1/22/59 | 1 Milling machine | 1,000 |

CMC did not pay petitioner either for the machinery or for the use of it. At all times relevant hereto, the machinery was retained on the books of petitioner, and depreciation thereon was deducted by it.

Frank Aparicio (hereinafter Aparicio) was hired as foreman of CMC's plant. Since he had no previous experience in the terrazzo strip industry, he went to petitioner's plant in Niagara Falls to learn the operations. Ross Johnson (hereinafter Johnson), who was familiar with the manufacture of terrazzo strip, showed Aparicio through the plant and explained the operation and use of the machines.

Thereafter, Aparicio returned to CMC's plant to begin operations. He hired a crew of 8 to 10 employees to work in the plant. While some of these employees had mechanical experience, none of them had worked in the terrazzo industry. Consequently, CMC had trouble pro-

ducing satisfactory strip. At Green's request and CMC's expense, Johnson spent 3 weeks in the Virgin Islands assisting in working out some of the flaws in the operation.

CMC's production of terrazzo strip consisted of two items. It processed zinc and brass standard strip as well as the zinc and brass rod portions of heavy top strip. The former was a finished product, ready for sale to customers. The rods, on the other hand, were only one component of the heavy top strip; the remainder of the work was done by petitioner in Niagara Falls.

CMC's operation with regard to the zinc and brass standard strip entailed running the metal through a punch press. The metal came in required widths, and CMC embossed two ribs down the length of the strip. The ribs added strength and stiffness to the metal. At the same time these strips were being embossed, it was necessary to insure that the metal was straight, for the straightness of the metal governed the level of the terrazzo floors. The straightness was controlled by the pressure placed on the strip during the embossing operation, and if the pressure were uneven or improper, the strip would be distorted.

Once the embossing and stamping operations were completed, the strip was a finished product. Thereafter, either it was shipped to petitioner, at its expense, inspected by it, and then sold to petitioner's distributors; or it was shipped directly to petitioner's distributors at petitioner's expense.

CMC's activities in connection with the processing of the zinc and brass rods consisted of two operations. The raw materials received by it were first ripped into strips. These strips were then turned on edge and moved along a saw which carved a small groove out of the bottom edge. This groove had to be the proper depth and width to allow the base section of the heavy top strip to be attached and locked into position. Care was also required to insure that the grooves were properly centered.

With CMC taking over the operations involved in manufacturing these terrazzo products, some of petitioner's resources were freed for research and development of improvements in the industry. In addition, petitioner was able to utilize much of the idle machinery it had in its plant.

All the equipment and the methods of operation, including the designs, dies for punching, milling machines, and saws, belonged to petitioner. In addition, while CMC could sharpen small dies and saws, if any major repairs were required or if the large dies needed sharpening, the items were shipped back to Niagara Falls for repair at petitioner's plant. Petitioner paid all freight charges on these shipments, although in most cases CMC paid for the repair work.

CMC ceased operations on or about January 31, 1961. All of its equipment and operations were shipped to Caribe Metals Inc. (hereinafter CMI), a corporation organized on July 15, 1960, under the laws of Panama. CMI conducted all of its affairs in Puerto Rico, and filed its corporate income tax returns there.

At the formation of CMI, it was necessary to hire new employees to run the machinery and manufacture the terrazzo products. Murray Chalfin (hereinafter Chalfin) was hired as general manager. As in the case of Aparicio, Chalfin had no previous experience in the terrazzo strip industry. In addition, the 16 to 18 employees hired by CMI were unskilled workers and had to be trained in the production of terrazzo strip. In 1961, Johnson, at Green's behest, traveled to Puerto Rico to assist in training the workmen and organizing production lines.

The operations carried on by CMI were the same as those of CMC. The same two items were produced; the same arrangements for repairs were followed; and the same relationship existed with petitioner, including the sale of substantially all of its products to petitioner.

The raw zinc and brass used by CMC and CMI (hereinafter where appropriate, CMC and CMI will be referred to jointly as Caribe), at the request of Green, was ordered by William McGowan (hereinafter McGowan), the president of petitioner, along with orders for petitioner. McGowan's activities with regard to supplying Caribe with raw zinc and brass were limited to placing orders with suppliers. Since for the years in issue petitioner purchased nearly all Caribe's finished standard strip and all its rod, McGowan could easily compute Caribe's requirements. Caribe was not involved in the actual ordering; nor were its managers aware of how much was ordered. Use of such bulk ordering arrangements enabled McGowan to work out more favorable purchase terms for both petitioner and Caribe. For example, since petitioner purchased large quantities, he was able to secure from one of the suppliers, as against the rest of the terrazzo industry, an exclusive brokerage agreement for zinc. In all cases, except where Caribe purchased raw materials directly from petitioner, the metal for Caribe was ordered directly from the supplier, was invoiced to Caribe with a copy of the invoice being sent to petitioner, and was paid for by Caribe directly to the suppliers.

The major portion of Caribe's raw zinc and brass was obtained from Europe through a broker, Norca Corp. (hereinafter Norca). McGowan would place large blanket orders with Norca based on the prevailing price. These blanket orders would call for delivery 6 or 8 months in the future. From these blanket orders, McGowan would issue releases for certain sizes and quantities to be shipped to either Caribe or petitioner. In this way, orders would be placed when it appeared the price

was at its lowest point, thus insuring a favorable price at the time of delivery. McGowan's expertise in the purchase of metals was an important factor, since the proper timing of orders was required in order to be able to buy at the best prices. Norca invoiced Caribe for the metal shipped to it and received payment from Caribe; however, because Norca was unfamiliar with Caribe, it requested that petitioner guarantee payment for this metal. Petitioner gave the guarantee but was never required to make good on it.[2]

Caribe also purchased unfabricated zinc strip from American Zinc Products Division (hereinafter American Zinc), and this metal was also ordered by McGowan. During the initial years, American Zinc did not request that petitioner guarantee payment for this metal; in later years such a guarantee was given, but petitioner never made any payments thereon.[3]

During 1961 and 1962, CMI purchased unfabricated zinc strip and rods from petitioner.[4] Petitioner sold this raw material to CMI at the cost from the supplier, plus the freight from New York City to Niagara Falls, a charge for part of the cost of slitting the metal into the correct lengths, and the freight for shipping the metal from Niagara Falls to Caribe. While petitioner invoiced CMI for this metal, actual payment was effected by offsetting the cost of this raw metal against the cost of finished standard strip and rods that petitioner purchased from CMI.

Caribe did not pay petitioner for McGowan's services in ordering the metal, and it received the full benefit of the favorable purchase terms made possible by including its purchases in the quantity ordering arrangements made by petitioner. Caribe also did not compensate petitioner for the guarantees given to Norca and American Zinc for the payments for the raw metal.

As previously noted, Caribe's processing activities with respect to the zinc and brass standard strip resulted in a finished product, ready for sale to distributors and customers. During the years in issue, almost 99 percent of Caribe's finished standard strip was sold to petitioner, and only a very small amount was sold locally.[5] All of the scrap resulting from the production of the strip was sold locally by Caribe. When petitioner received the zinc and brass standard strip from Caribe, it

---

[2] The parties have stipulated the number of pounds and the price of the several gauges of materials which Caribe purchased from Norca. They have also stipulated a table for converting pounds to linear feet of various sizes of strip and rod.

[3] The parties have stipulated the number of pounds and the price of the several gauges of materials which Caribe purchased from American Zinc.

[4] The parties have stipulated the number of pounds and the price of the several gauges of materials which CMI purchased from petitioner during 1961 and 1962.

[5] The parties have stipulated the number of linear feet of fabricated zinc and brass strip purchased by petitioner from Caribe and the price paid therefor during the fiscal years ending June 30, 1959, through June 30, 1962.

spot inspected the metal to make certain the strip was straight, and then repacked it for final sale.

Petitioner and Caribe determined the price petitioner paid for the finished strip on the basis of a percentage off petitioner's published pricelist for sale to its customers; this method was the one customarily used in the industry. When petitioner found it necessary in emergency situations to purchase finished strip from one of its competitors— either Rudel or MTBS—it bought from them at a fraction off list price. In addition, when petitioner sold its products to its main distributor, Terrazzo & Marble Supply Co. (hereinafter T & M), which purchased approximately 70 percent of all of petitioner's merchandise, the price was determined by deducting a percentage off list price.

Petitioner published a new pricelist for each year; however, because of competition and other factors, petitioner was not always able to command the price set forth on each new pricelist. Although petitioner published a 1959 pricelist, it continued to make sales on the basis of the 1958 pricelist until November 1, 1961. Thus, for 1958, 1959, 1960, and until November 1, 1961, petitioner based the price paid to Caribe for finished strip on the 1958 pricelist. After November 1, 1961, sales were made on the basis of a pricelist published for 1961. Thus, during the last 2 months of 1961 and all of 1962, Caribe's price for finished strip was based on the 1961 pricelist.

From the inception of CMC in 1958 to November 1, 1961, petitioner paid Caribe for the finished strip on the basis of the 1958 list price less 15 percent. This price purportedly permitted a profit to petitioner of 5 percent when it resold the finished strip to T & M, since T & M was purchasing from petitioner at 10 percent off the 1958 pricelist. Beginning on November 1, 1961, through 1962, petitioner paid Caribe a price of 20 percent off the 1961 list price. The 5-percent difference from the old pricing formula represented a quantity discount given to certain customers, including T & M, under the 1961 pricelist. The resale price based on this latter pricelist was also designed to yield a 5-percent profit to petitioner.

Petitioner never realized a profit, however, on the resale of the strip purchased from Caribe. The formula did not take into account the cost of shipping the finished strip from Niagara Falls to T & M and other customers and distributors. This shipping cost amounted to approximately 4 percent of the published list price. In addition, when petitioner resold its strip, it gave a trade or cash discount which averaged 1 percent of the published list price. This discount also was not taken into account in computing the percentage off list price paid to Caribe for the finished strip. These two items consumed most, if

not all, of the 5 percent reserved as petitioner's profits on the resale of the strip purchased from Caribe.

The following table reflects (1) the list price of all the strip which petitioner purchased from Caribe [6] and (2) the price paid Caribe for the strip:

| Year ending June 30— | List price | Price paid |
|---|---|---|
| 1959 | $309, 241. 60 | $262, 855. 25 |
| 1960 | 362, 032. 00 | 307, 727. 20 |
| 1961 (CMC) | 114, 823. 00 | 97, 599. 51 |
| 1961 (CMI) | 31, 274. 60 | 26, 583. 36 |
| 1962 | 222, 901. 20 | 189, 466. 03 |

Petitioner has conceded that an adjustment of 10 percent off the list price is required to make the prices at which Caribe sold the strip comparable with uncontrolled prices. In addition, to clearly reflect petitioner's incomes, a reallocation is required to compensate for circumstances not normally present in the relationships of uncontrolled parties. The following table sets forth the conceded adjustments to price, the additional reallocation, and the total reallocation of income attributable to strip:

| Year ending June 30— | Conceded adjustment [1] | Additional reallocation | Total |
|---|---|---|---|
| 1959 | $30, 924 | $24, 700 | $55, 624 |
| 1960 | 36, 203 | 29, 000 | 65, 203 |
| 1961 (CMC) | 11, 482 | 9, 100 | 20, 582 |
| 1961 (CMI) | 3, 127 | 2, 400 | 5, 527 |
| 1962 | 22, 290 | 17, 800 | 40, 090 |

[1] In its brief, petitioner computes the amounts so conceded as 10 percent of the price paid to Caribe. At the trial, however, petitioners counsel expressly conceded an adjustment equal to 10 percent of the list price. The above table employs this latter formula.

As previously noted, the production of the zinc and brass rods by Caribe was only one step in the process of making heavy top strip. The rod, being only a component of this top strip, could not be sold directly to petitioner's customers in that form. Thus, all the rod that Caribe produced was sold to petitioner. All of petitioner's purchases of rod from CMC were f.o.b. San Juan, Puerto Rico, for there was no direct method of shipment from the Virgin Islands to the United States. All of petitioner's purchases of rod from CMI were f.o.b. San Juan, Puerto Rico.

After Caribe sold the processed rod to petitioner, the latter inspected it for straightness and attached it to the base section by a crimping operation. This heavy top strip was then sold by petitioner to its distributors and customers.

[6] The list price of the strip purchased from Caribe was computed in the light of evidence that the price actually was 15 percent off list for the period prior to Nov. 1, 1961, and 20 percent off list thereafter. The list prices for CMC and CMI for the fiscal year ending June 30, 1961, assume sales of strip in a proportionate amount each month of the fiscal year.

Petitioner and Caribe were unable to determine the price to be paid for the rod based upon a percentage off a published pricelist as was done in the case of the finished strip, because petitioner had no established pricelists for the rod. Petitioner and Caribe determined a price attributable to the rod portion based upon the cost for the various components of the list price for the heavy top strip, including the cost of the metal from the various suppliers, the cost attributable to the various elements and operations involved in making the heavy top strip, and other factors, such as freight and cost of boxes where such costs were necessary. The portion of the price of the heavy top strip allocable to the rod was approximately the price which petitioner would have been required to pay if it had bought zinc rod from Matthiessen and Hegler Zinc Co. (hereinafter M & H), one of the only zinc mills which produces the same type of rod, and brass rod from Bridgeport Brass Co. (hereinafter Bridgeport), which produces a similar brass rod.

The prices paid by petitioner for the rod in each of the years in issue were comparable to those prices which would have been charged by unrelated parties. Clearly to reflect petitioner's income, however, a reallocation is required with respect to the rod to compensate for circumstances not normally present in the relationships of uncontrolled parties. The following table reflects the price paid by petitioner to Caribe for the rod and the reallocation of income attributable thereto:

| Year ending June 30— | Price paid by petitioner | Reallocation |
|---|---|---|
| 1959 | $198,280.53 | $15,800 |
| 1960 | 264,217.10 | 21,100 |
| 1961 (CMC) | 149,607.23 | 11,900 |
| 1961 (CMI) | 27,789.75 | 2,200 |
| 1962 | 407,387.51 | 32,500 |

In addition to the foregoing reallocations with respect to the strip and rod, petitioner on brief has conceded that the following adjustments should be made for equipment furnished to Caribe by petitioner, freight, and miscellaneous supplies. The following table reflects these conceded adjustments:

| | 1959 | 1960 | 1961 | 1962 |
|---|---|---|---|---|
| Rental adjustment on equipment furnished | $946 | $946 | $946 | $946 |
| Freight from Caribe to Niagara Falls | 18,858 | 20,924 | 11,301 | 14,821 |
| Miscellaneous supplies | 2,639 | 3,648 | 3,257 | 221 |
| Total | 22,443 | 25,518 | 15,504 | 15,988 |

In its income tax returns for the years ending June 30, 1959, 1960, 1961, and 1962, petitioner deducted as a cost of goods sold, amounts paid to Caribe for the purchase of finished strip and rod. In his notices

of deficiency, respondent, under section 482, reallocated to petitioner gross income in the following amounts:

| Year ending June 30— | Amount reallocated |
|---|---|
| 1959 | $208, 263. 00 |
| 1960 | 237, 937. 00 |
| 1961 | 100, 229. 00 |
| 1962 | 255, 611. 16 |

## ULTIMATE FINDINGS

In order clearly to reflect the income of petitioner for its fiscal years ending June 30, 1959, 1960, 1961, and 1962, the following amounts of gross income are required to be reallocated from Caribe to petitioner:

| Year ending June 30— | Strip | Rod | Conceded adjustments | Total |
|---|---|---|---|---|
| 1959 | $55, 624 | $15, 800 | $22, 443 | $93, 867 |
| 1960 | 65, 203 | 21, 100 | 25, 518 | 111, 821 |
| 1961 | 26, 109 | 14, 100 | 15, 504 | 55, 713 |
| 1962 | 40, 090 | 32, 500 | 15, 988 | 88, 578 |

## OPINION

Section 482 confers broad power upon the Commissioner of Internal Revenue to reallocate the gross income of commonly controlled organizations as follows:

In any case of two or more organizations, trades, or businesses * * * owned or controlled directly or indirectly by the same interests, the * * * [Commissioner] may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, * * * if he determines that such * * * allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses.

The goal of this "statutory allocation procedure is to insure that controlled taxpayers are placed on a parity with uncontrolled taxpayers." *Local Finance Corporation* v. *Commissioner*, 407 F. 2d 629, 632 (C.A. 7, 1969), affirming 48 T.C. 773 (1967). This objective is to be achieved "by determining, according to the standard of an uncontrolled taxpayer, the true taxable income from the property and business of a controlled taxpayer." Sec. 1.482–1(b)(1), Income Tax Regs. "The authority to determine true taxable income extends to any case in which either by inadvertence or design the taxable income, in whole or in part, of a controlled taxpayer, is other than it would have been had the taxpayer in the conduct of his affairs been an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer." Sec. 1.482–1(c), Income Tax Regs.

Quite clearly the present case is one in which respondent could appropriately exercise his section 482 reallocation authority. The parties have stipulated that petitioner was controlled by the same interests as Caribe, and at the trial petitioner conceded that several adjustments are required in order clearly to reflect its income within the meaning of section 482. Having made these concessions, petitioner does not seriously challenge respondent's right to employ the section but contends that respondent has misapplied it.

In reviewing the propriety of respondent's application of section 482, we are constrained to observe that the section gives him broad discretionary power. A challenge to the exercise of this power places a heavy burden upon the taxpayer. *Aiken Drive-In Theatre Corporation* v. *United States*, 281 F. 2d 7, 10 (C.A. 4, 1960) ; *Spicer Theatre, Inc.* v. *Commissioner*, 346 F. 2d 704, 706 (C.A. 6, 1965), affirming 44 T.C. 198 (1964). "[Respondent's] determination in this regard will be overturned only if shown by the taxpayer to have been arbitrary or unreasonable. A determination as to whether or not the Commissioner has exceeded or abused his discretion turns upon questions of fact." *Ballentine Motor Co.* v. *Commissioner*, 321 F. 2d 796, 800 (C.A. 4, 1963), affirming 39 T.C. 348 (1962) ; *Commissioner* v. *Chelsea Products*, 197 F. 2d 620 (C.A. 3, 1952), affirming 16 T.C. 840 (1951).

We think petitioner has made the requisite showing. While the notices of deficiency, cast in broad general terms, give no clue as to the formula respondent used in making his determinations in this case, the reports of the revenue agent on which those determinations were based and the agent's testimony indicate that the only income of CMC and CMI which was not reallocated to petitioner was a sum equal to 20 percent of the cost of the goods which they sold. In preparing his initial report on CMC, the agent's findings led him to adopt the premise that CMC did not purchase or own the metal which it processed but rather performed a stamping service on metal at all times owned by petitioner. He then collected data on the cost of stamping operations, and, in the light of conversations with other revenue agents handling section 482 cases involving other industries, he decided that a profit equal to 20 percent of CMC's costs would be reasonable. The agent reallocated all the rest of CMC's reported income to petitioner.[7]

Subsequently, Rev. Proc. 63–10, 1963–1 C.B. 490, was issued prescribing a comparable uncontrolled price method rather than a cost-

---

[7] No reasoned analysis supports the use of 20 percent rather than some other percentage of cost as a base for computing the prices used by respondent. The agent testified :

"Well, I can just sit back and say that it appeared to me that twenty percent profit, net profit on an operation such as this was more than reasonable. I figured if the taxpayer were willing to accept that, I thought we would be getting away with a very good deal, and if not, he would prove otherwise, and he never proved otherwise."

plus method as the preferred standard for making reallocations under section 482. Proceeding on his premise that CMC was only a contractor hired to stamp the metal strips and fabricate the rods, the agent investigated the prices that independent contractors would have charged for this service. His computations under this method reflected larger deficiencies than under the cost-plus method used in his first examination, and so no further adjustments were made in the reallocations from CMC derived from the original report. The premise that CMI did not own the metal which it processed was also used in reallocating part of CMI's income to petitioner.

The evidence shows unmistakably that respondent's premise that CMC and CMI did not acquire ownership of the metal but merely performed a stamping operation is erroneous. The stipulated facts include the following:

CMC and CMI purchased their raw materials from Norca Corporation and American Zinc Products Division in the following manner: McGowan placed the orders with the suppliers from petitioner's office in Niagara Falls.

Consistently, the stipulation reflects that CMC and CMI resold the finished products to petitioner as follows:

All of petitioner's purchases of strips and rods from CMC were f.o.b. San Juan, Puerto Rico. Since there was no method for direct shipment from the Virgin Islands to the United States, said goods first had to be shipped to Puerto Rico. All of petitioner's purchases of strips and rods from CMI were f.o.b. San Juan, Puerto Rico. All shipping costs on goods purchased by petitioner from CMC and CMI were paid for by petitioner and deducted by it on its returns.

Other language in the stipulation expressly states or assumes that Caribe purchased the materials, processed them, and sold the finished products to petitioner. While petitioner did not deal with Caribe as it would have dealt with an unrelated entity, we think the revenue agent erred in treating Caribe as if it were a mere fabricator for hire.

The agent's erroneous assumption that Caribe merely processed materials belonging to petitioner led him into fundamental errors in computing an arm's-length price for the strip and the rod. The regulations interpreting section 482 contemplate that uncontrolled sales are comparable for pricing purposes only if the physical property and the circumstances of the sale are similar. In this connection, section 1.482-2(e)(1)(i), Income Tax Regs., sets forth the methods to be used in reallocating income between controlled corporations when tangible property has been sold from one to the other "at other than an arm's length price." It provides that the district director may make allocations between the seller and buyer to reflect an arm's-length price for the sale, i.e., "the price that an unrelated party would have paid under the same circumstances for the property involved in the con-

trolled sale." Three methods of determining an arm's-length price on the sale of tangible property and the standards for applying each method are enumerated. The first method, which must be used where appropriate and the one which is the subject of our inquiry, is the comparable uncontrolled price method. Section 1.482–2(e)(2), Income Tax Regs., states that:

(i) Under the method of pricing described as the "comparable uncontrolled price method", the arm's length price of a controlled sale is equal to the price paid in comparable uncontrolled sales, adjusted as provided in subdivision (ii) of this subparagraph.

(ii) "Uncontrolled sales" are sales in which the seller and the buyer are not members of the same controlled group. * * * Uncontrolled sales are considered comparable to controlled sales if the physical property and circumstances involved in the uncontrolled sales are identical to the physical property and circumstances involved in the controlled sales, or if such properties and circumstances are so nearly identical that any differences either have no effect on price, or such differences can be reflected by a reasonable number of adjustments to the price of uncontrolled sales. * * *

Respondent's basic premise that petitioner at all times owned the materials used in the fabrication of the strip and rod resulted in an erroneous characterization of the "circumstances involved in the controlled sales," and consequently, his determinations based on that premise were an abuse of discretion. His reallocations, unsupported by industry standards or practice, were both arbitrary and unreasonable. Indeed, he implicitly recognizes his error, since the amounts of "overcharges" which, on brief, he asks us to find in the light of the testimony are substantially less than the amounts of gross income reallocated in the notices of deficiency.

Since petitioner concedes that some reallocation of income is necessary and respondent's determinations in the notices of deficiency are manifestly wrong, the duty rests with the Court to find the arm's-length price for the standard strip and rods and to make any other reallocations that may be required clearly to reflect petitioner's income. In making these findings, we must use our best judgment in the light of all the evidence. *Nat Harrison Associates, Inc.*, 42 T.C. 601, 617–618 (1964), acq. 1965–2 C.B. 5; *Pauline W. Ach*, 42 T.C. 114, 126–127 (1964), affd. 358 F. 2d 342 (C.A. 6, 1966), certiorari denied 385 U.S. 899 (1966).

First, we consider the standard strip. The evidence shows that the finished strip produced by Caribe was similar to the product petitioner occasionally purchased from Rudel and MTBS, other competing manufacturers, and was similar to the strip which petitioner manufactured and sold to T & M. As detailed in our Findings, the normal practice in the industry is for manufacturers to establish list prices for finished products and to sell these products to distributors and jobbers at a

percentage off the list price. Petitioner has shown that this is the practice of its competitors and that petitioner itself follows this procedure in selling strip to its distributors, including T & M. Respondent has not introduced any evidence to the contrary.

Applying the comparable uncontrolled price method as described in section 1.482-2(e)(2)(i), Income Tax Regs., we believe the sale of Caribe's finished standard strip is comparable to sales of similar finished products by others in the industry. Arm's-length prices for the sales of finished strip between petitioner and Caribe can be derived by ascertaining the percentage by which the list price should be reduced.

In establishing the price of the strip purchased from Caribe, petitioner applied percentage reductions to its published list price, i.e., 15 percent off list price in 1958, 1959, 1960, and until November 1, 1961; and 20 percent off list price for the remainder of 1961 and during 1962. Petitioner concedes that these prices should be reduced by an additional 10 percent of the list price in order to assign to petitioner a profit on the resale of Caribe's production comparable to that which it realized on sales of its own production to T & M, and we agree.

We think a further reallocation of income is required clearly to reflect petitioner's income attributable to the strip. This reallocation will compensate for intangible factors involved in the Caribe-petitioner relationship which are not normally present in the relationships of organizations not commonly controlled. These factors include the services of McGowan in ordering the metal fabricated by Caribe; the guarantee of the purchase price of the metal; the crating and shipment of some of the metal; the sharpening and repair of dies; the benefits flowing from petitioner's name and experience in the industry; and the availability of petitioner as a ready market for all production. These last factors, for example, indirectly gave Caribe the benefit of petitioner's preeminent position in the industry and relieved it of advertising, sales, and similar expenses. While these factors defy precise measurement, we are satisfied that an adjustment for them is required, and we have arrived at the amounts of the annual reallocations reflected in our Findings by weighing all the evidence presented at the trial. *Pauline Ach, supra; Nat Harrison Associates, Inc., supra.*

Since the rod, a component of the heavy strip, was not a finished product, ready for sale to customers generally, no list price was established for it. Consequently, we must look to other data in ascertaining an arm's-length price. Respondent asks us to find as an ultimate fact that "the independent arm's length comparable price for fabricating rods * * * was not more than 15 cents per pound of metal." He bases this request upon testimony as to "what Utility [Utility Manufacturing Company] would have charged Chase [Chase Brass and Copper

Company] had it engaged in" comparable manufacturing activities.

We are not satisfied that the Utility-Chase pricing arrangement is comparable. Utility fabricated brass rods only, whereas Caribe produced and sold both brass and zinc rods. The rods produced by Utility were shaped differently, and this difference affected their quality as well as the processes required. Furthermore, Utility did not produce rods for Chase after 1958, and we are not satisfied that the pricing arrangement for the pre-1958 period provides a reliable guide for the period before the Court. Finally, the employee of Utility who testified as to its pricing policy stated that Utility merely doubled the cost of the material in arriving at the price of the rods; he made no distinction between the various sizes of rods, even though the processing costs obviously would not vary in proportion to the size and cost of material being processed. For these reasons, we decline to make the ultimate finding of an arm's-length price requested by respondent.

Petitioner urges that the prices it would have been required to pay M & H and Bridgeport Brass for zinc and brass rod, respectively, with minor adjustments, is the price which Caribe received for the processed rod, and that section 482 may not, therefore, properly be applied. McGowan and Green arrived at the price to be paid Caribe by analyzing the elements that entered into the pricing of the heavy strip (cost of the steel strip; purchasing of the strip; crimping of the rod to the strip; freight; discounts; containers; profits; commissions; and the rod), and the prices paid Caribe for the rod conform quite closely to the M & H and Bridgeport Brass prices for a similar product. Petitioner's evidence based upon the prices of M & H and Bridgeport Brass for rods indicates that the prices Caribe charged petitioner for rod are comparable to the uncontrolled prices.

As in the case of the strip, however, we think a reallocation of gross income is required clearly to reflect petitioner's income attributable to the rod, because petitioner did not deal with Caribe in the same manner as it would have dealt with an unrelated party. As we view the evidence, many of the same circumstances that require reallocations with respect to the strip necessitate reallocations for the rod.[8] We have computed the reallocations reflected in our Findings in the light of all the facts.

In addition to the reallocations of income which we have discussed, petitioner has conceded overall adjustments to its income for freight, machinery rental, and miscellaneous supplies. The amounts of all

[8] Since the standard strip was a finished product ready for sale to customers and the rod was only one component of a finished product and required further processing, the economic significance of the intangible factors involved in the Caribe-petitioner relationship is different for strip than for rod. Consequently, we have made separate reallocations of gross income attributable to the sales of rod and the sales of strip.

of these adjustments to gross income are set forth in our Ultimate Findings.

The parties agree that petitioner is entitled to the tax adjustment provided for in Rev. Proc. 64–54, 1964–2 C.B. 1008.

To reflect the concessions of the parties and the reallocations herein found,

*Decisions will be entered under Rule 50.*