EDWARD K. EDWARDS AND HELEN EDWARDS, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

TEX EDWARDS COMPANY, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 4371–73, 4372–73.   Filed November 15, 1976.

---

*Hugh R. Dowling* and *Howard O. Morris, Jr.*, for the petitioners.
*Robert J. Shilliday, Jr.*, for the respondent.

IRWIN, *Judge:* Respondent determined the following deficiencies and overassessment in petitioners' Federal income taxes:

| | Taxable year ended | Deficiency | Overassessment |
|---|---|---|---|
| Edward K. and Helen Edwards ............ | 12/31/68 | | $928.18 |
| | 12/31/69 | $10,660.02 | |
| | 12/31/70 | 15,788.88 | |
| Tex Edwards Co., Inc. ............................. | 5/31/69 | 11,572.42 | |
| | 5/31/70 | 25,416.72 | |

The issues remaining for our determination are: (1) Whether respondent properly "allocated" income, pursuant to section 482,[1] in respect of sales of equipment by a partnership to a corporation, both of which were controlled by the individual petitioners; and (2) the correct amount of depreciation deductions allowable to the corporation with respect to certain equipment used by it in its construction business.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

Edward K. and Helen Edwards, husband and wife, filed joint Federal income tax returns for the years 1968, 1969, and 1970 at the Southeast Service Center, Chamblee, Ga. At the time the petitions were filed, the Edwardses were residents of Pensacola, Fla.

Tex Edwards Co., Inc. (hereafter the corporation or Tex Edwards), timely filed U.S. Corporation Income Tax Returns for its taxable years ending May 31, 1969, and May 31, 1970.

---

[1] All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.

During the years in issue, the Edwardses owned approximately 99 percent of the corporation's stock. The corporation's principal business activities included rigging and erection in connection with heavy construction and also the rental of heavy rigging and construction equipment to other construction contractors.

The Edwards Equipment Sales Co. (hereafter the partnership) was a partnership in which the Edwardses were equal partners. The partnership was an authorized dealer for Harnischfeger Corp. (hereafter Harnischfeger), a manufacturer of cranes and heavy construction equipment. In conjunction with such dealership, the partnership also sold used equipment.

The partnership was formed by the Edwardses in 1963 in order to obtain a dealership contract with Harnischfeger and to thereafter offer equipment manufactured by Harnischfeger to contractors in the northwest Florida area. After formation of the partnership, the corporation purchased most of its cranes and associated heavy equipment from the partnership. The partnership had minimal overhead expense since it: (1) Shared an office with the corporation; (2) did not maintain a sales force; and (3) did not provide service or warranty work on the equipment it sold.

The following chart sets forth relevant data regarding sales made by the partnership during the years in issue:

| Item | Year of sale | Cost to partnership | Sales price to corporation | Sales price to unrelated entity | Manufacturer's list price |
|---|---|---|---|---|---|
| Trackmaster crawler tractor and trailer | 1968 | $5,058.75 | $5,078.75 | | $6,675.00 |
| Used equipment (4 separate items) | 1968 | 152,750.00 | | $158,750.00 | |
| Parts and supplies | 1968 | 2,484.47 | | 4,920.87 | |
| P. & H. R-125 crane[1] | 1969 | 32,373.60 | 32,873.60 | | 41,125.00 |
| P. & H. H-418T crane[1] | 1969 | 59,888.52 | 59,888.52 | | 70,637.05 |
| Piper Aztec airplane | 1969 | 65,880.00 | 66,380.00 | | |
| Parts and supplies | 1969 | 1,510.56 | | 2,447.95 | |
| P. & H. R-125 crane[1] | 1970 | 34,523.42 | | 39,380.88 | 44,751.00 |
| Trailer | 1970 | 8,525.94 | 8,700.00 | | |

| | | | | |
|---|---|---|---|---|
| P. & H. 325-TCWA crane[1] | 1970 | 55,151.81 | 56,651.81 | 67,588.00 |
| P. & H. 325-TCWA crane[1] | 1970 | 52,534.90 | 54,034.90 | 64,381.00 |
| P. & H. 320 crane[1] | 1970 | 33,509.38 | 34,509.38 | 43,632.00 |
| P. & H. 440 crane[1] | 1970 | 70,500.00 | 72,000.00 | 70,500.00 |
| Used equipment (4 separate items) | 1970 | 93,550.00 | 95,500.00 | |
| Parts and supplies | 1970 | 4,015.80 | 3,777.51 | |

[1] Denotes equipment manufactured by Harnischfeger.

Only one item of new equipment was sold by the partnership to an unrelated party during the years in issue. This was a P. & H. R-125 crane, manufactured by Harnischfeger, which was sold to Carroll Construction Co. for $39,380.88 in 1970. This crane cost the partnership $34,523.42 and had a manufacturer's list price of $44,751. The gross profit percentage (gross profit as a percentage of cost) realized by the partnership in respect of this sale was 14 percent.

Noonan Construction Co. (hereafter Noonan), headquartered in Pensacola, Fla., was engaged primarily in highway construction. In the course of its business, Noonan owned and operated heavy construction equipment similar to that owned by Tex Edwards. The cranes owned by Noonan had a lighter "lift capacity" and a "shorter reach" than those owned by Tex Edwards. As a consequence, Noonan sometimes used the services of Tex Edwards when Noonan's own equipment was inadequate for a particular purpose. Noonan has never purchased equipment from the partnership nor has it ever owned equipment manufactured by Harnischfeger. In purchasing construction equipment, Noonan rarely paid the manufacturer's list price and, in fact, usually received a discount ranging from 5 to 20 percent of such list price.

M. D. Moody & Sons, Inc. (hereafter Moody), was a heavy construction equipment dealer with locations in Jacksonville, Tampa, and Fort Lauderdale, Fla. Although Moody made an effort to receive the manufacturer's list price for the equipment it sold, it usually received less than that amount.

Pilot Equipment Co. (hereafter Pilot) was a heavy construction equipment dealer, serving the north Florida and south Georgia areas, during the years in issue. Pilot represented

several manufacturers of heavy construction equipment, including Harnischfeger. Pilot maintained a complete sales organization and offered service and warranty work on the equipment it sold. Pilot attempted to maintain a profit margin equal to that which would result if it sold each item at the manufacturer's list price. However, Pilot was able to maintain that profit margin only where: (1) The sale was in the form of a rental with an option to purchase; (2) the manufacturer granted an additional discount; or (3) Pilot made a profit on the resale of equipment traded in. As a general matter Pilot offered its customers a minimum discount equal to 5 percent of the list price for the equipment sold. Pilot experienced some difficulty in servicing the Harnischfeger equipment. Had it not been for the expense of maintaining a service department as well as a sales organization, Pilot would have sold equipment at an even greater discount.

Associated Equipment Distributors (hereafter Associated) was a trade organization which had a membership consisting of approximately 500 equipment dealers across the country. Each year Associated conducted a survey among its members for the purpose of computing an average gross profit margin. The record does not indicate how many members actually participated in the survey. For the years in issue the average gross profit margin for those dealers who participated in the survey was 20 percent.

Under authority of section 482, respondent has "allocated" income to the partnership for each of the years in issue in an amount equal to the difference between the profit the partnership would have made if it had sold Harnischfeger equipment to the corporation for list price and the profit actually realized and reported by the partnership in respect of such sales.

During the 1960's there were rapid technological advances made in the type of heavy construction equipment used by the corporation. The corporation followed the practice of updating its equipment in order to take advantage of such advances and to stay ahead of its competition. The corporation maintained its equipment in excellent condition. The actual holding period and the percentage of original cost which was recovered on the trade-in of heavy equipment by the

corporation from August 1968 to September 1970 were as follows:

| Equipment | Month/year purchased | Month/year traded | Holding period | Net invoice cost | Trade-in received | Percent of cost recovered |
|---|---|---|---|---|---|---|
| 325-TC crane..... | Dec. 1964 | Aug. 1968 | 3 yrs., 8 mos. | $35,822 | $27,250 | 76 |
| 325-TC crane..... | Oct. 1964 | Sept. 1968 | 3 yrs., 11 mos. | 33,004 | ¹43,500 | 81 |
| 155-BTC crane.. | Apr. 1964 | Sept. 1968 | 4 yrs., 5 mos. | 20,400 | | |
| 660-TC crane..... | Feb. 1966 | Oct. 1968 | 2 yrs., 8 mos. | 88,701 | 82,000 | 92 |
| Trailer ............... | Nov. 1968 | May 1970 | 1 yr., 6 mos. | 5,161 | 5,300 | 103 |
| 325-TC crane..... | 1966 | Sept. 1970 | 4 yrs. | 42,554 | 31,000 | 73 |
| 325-TC crane..... | 1965 | Sept. 1970 | 5 yrs. | 42,549 | 32,500 | 76 |
| D-5 caterpillar.. | Feb. 1969 | Sept. 1970 | 1 yr., 7 mos. | 29,118 | 24,750 | 85 |

¹ These two items were traded in at the same time for a total trade-in value of $43,500.

For the years in issue, the corporation claimed depreciation deductions with respect to its heavy equipment, using the double declining balance method based upon a useful life for each item of equipment of 8 years. The corporation did not make a determination of salvage value and did not take salvage value into account in claiming depreciation.

Based on the corporation's past experience, respondent determined that the useful life of each item of heavy equipment was 5 years and that the salvage value of each item of such equipment was equal to 80 percent of its original cost to the corporation. After taking into account the adjustment to salvage value allowed by section 167(f), respondent recomputed the allowable depreciation for each of the years in issue. Respondent also disallowed 30 percent of the depreciation claimed by the corporation in respect of a Piper Aztec airplane, based upon his determination that 30 percent of the airplane's use was not in connection with the corporation's business.

OPINION

Issue 1. Section 482 Allocation

The individual petitioners were equal partners in a partnership, known as Equipment Sales Co., and were also the controlling shareholders in Tex Edwards Co., Inc. During the years in issue the partnership sold various items of new equipment, manufactured by Harnischfeger, to the corporation. For each of the years in issue, respondent has allocated

income to the partnership in an amount equal to the difference between the profit the partnership would have made if it had sold Harnischfeger equipment to the corporation for list price and the profit actually realized and reported by the partnership in respect of such sales.

Petitioners argue that respondent has not allocated income actually realized by a member of a controlled group, as he is authorized to do under section 482, but has rather "created" income which was not actually realized by either the corporation or the partnership. Petitioners believe that respondent has no authority under section 482 to "create" income.

Section 482[2] confers broad power upon the respondent to reallocate the gross income of commonly controlled organizations, where such reallocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations. The purposes of section 482, and the Commissioner's authority thereunder were described in *Pauline W. Ach*, 42 T.C. 114, 125–126 (1964), affd. 358 F.2d 342 (6th Cir. 1966), cert. denied 385 U.S. 899 (1966), thusly:

Respondent may allocate income under section 482 in order to prevent "evasion of taxes or clearly to reflect the income." The legislative history of section 482 indicates that it was designed to prevent evasion of taxes by the arbitrary shifting of profits, the making of fictitious sales, and other such methods used to "milk" a taxable entity. * * * The Commissioner has considerable discretion in applying this section and his determinations must be sustained unless he has abused his discretion. We may reverse his determinations only where the taxpayer proves them to be unreasonable, arbitrary, or capricious. * * *

See *Robert M. Brittingham*, 66 T.C. 373 (1976); *Marc's Big Boy-Prospect, Inc.*, 52 T.C. 1073, 1092–1093 (1969), affd. sub nom. *Wisconsin Big Boy Corp. v. Commissioner*, 452 F.2d 137 (7th Cir. 1971); *T.V.D. Co.*, 27 T.C. 879, 884 (1957); H. Rept. No. 2, 70th Cong., 1st Sess. (1927), 1939–1 C.B. (Part 2) 384, 395; S.

---

[2] SEC. 482. ALLOCATION OF INCOME AND DEDUCTIONS AMONG TAXPAYERS.

In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary or his delegate may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses.

Rept. No. 960, 70th Cong., 1st Sess. (1928), 1939–1 C.B. (Part 2) 409, 426.

The effect of a proper application of section 482 is to place:

a controlled taxpayer on a parity with an uncontrolled taxpayer, by determining according to the standard of an uncontrolled taxpayer, the true net income of a controlled taxpayer. * * * Thus, income which has been artificially diverted to one member of a controlled group but which in fact was earned by another member of the group may be "allocated" by the Commissioner under section 482 to the entity which really earned it. * * * [*Huber Homes, Inc.*, 55 T.C. 598, 605 (1971).]

In the instant case, as in *Huber Homes, Inc., supra,* respondent does not contend that any of the corporation's income was not earned by it or that any of *its* income should be allocated to the partnership. Rather, respondent contends that had the corporation and the partnership dealt at arm's length, the partnership *would* have received income in respect of sales to the corporation in an amount equal to the difference between the manufacturer's list price for equipment sold and the cost of such equipment to the partnership. Accordingly, respondent has "allocated" income to the partnership to the extent such amounts exceed the income actually realized and reported by the partnership in respect of these sales. In so doing, respondent relies upon sections 1.482–1(d)(4) and 1.482–2(e)(1)(i), Income Tax Regs.[3]

---

[3] (4) If the members of a group of controlled taxpayers engage in transactions with one another, the district director may distribute, apportion, or allocate income, deductions, credits, or allowances to reflect the true taxable income of the individual members under the standards set forth in this section and in §1.482–2 notwithstanding the fact that the ultimate income anticipated from a series of transactions may not be realized or is realized during a later period. For example, if one member of a controlled group sells a product at less than an arm's length price to a second member of the group in one taxable year and the second member resells the product to an unrelated party in the next taxable year, the district director may make an appropriate allocation to reflect an arm's length price for the sale of the product in the first taxable year, notwithstanding that the second member of the group had not realized any gross income from the resale of the product in the first year. Similarly, if one member of a group lends money to a second member of the group in a taxable year, the district director may make an appropriate allocation to reflect an arm's length charge for interest during such taxable year even if the second member does not realize income during such year. The provisions of this subparagraph apply even if the gross income contemplated from a series of transactions is never, in fact, realized by the other members.
* * *

(e) *Sales of tangible property*—(1) *In general.* (i) Where one member of a group of controlled entities (referred to in this paragraph as the "seller") sells or otherwise disposes of tangible property to another member of such group (referred to in this paragraph as the "buyer") at other than an arm's length price (such a sale being referred to in this paragraph as a "controlled sale"), the district director may make

We have repeatedly held that section 482 authorizes only an allocation of income actually realized at some point in time by a member of the controlled group as a result of the transaction or transactions in issue. *Kahler Corp.*, 58 T.C. 496 (1972), revd. 486 F.2d 1 (8th Cir. 1973); *Kerry Investment Co.*, 58 T.C. 479 (1972), revd. in part 500 F.2d 108 (9th Cir. 1974); *Huber Homes, Inc., supra; PPG Industries, Inc.*, 55 T.C. 928 (1970); *Smith-Bridgman & Co.*, 16 T.C. 287 (1951). As we said in *Kahler Corp., supra* at 506:

a prerequisite to the Commissioner's allocation authority under section 482 is the existence of an item of income, deduction, credit, or allowance which had its genesis in the particular transaction between the related parties. * * *

Respondent does not seek to distinguish the above cases but requests that we reevaluate our holdings therein and reach a different result here. In respondent's opinion it is irrelevant whether the entity from which income is "allocated" did or did not have gross income as a result of the transactions in question and he has been sustained in that view by various of the Circuit Courts of Appeals. In *B. Forman Co. v. Commissioner*, 453 F.2d 1144 (2d Cir. 1972), affg. in part and revg. in part 54 T.C. 912 (1970), cert. denied 407 U.S. 934 (1972), the Second Circuit ruled that the Commissioner is authorized to "allocate" interest income on a noninterest-bearing loan between related parties irrespective of whether income is realized within the controlled group as a result of the loan. The Fifth, Ninth, and Eighth Circuits have likewise held that the Commissioner has such authority regardless of whether the borrowed funds generate income. *Fitzgerald Motor Co. v. Commissioner*, 508 F.2d 1096 (5th Cir. 1975), affg. on a different ground 60 T.C. 957 (1973); *Kerry Investment Co. v. Commissioner*, 500 F.2d 108 (9th Cir. 1974), affg. in part and revg. in part 58 T.C. 479 (1972); *Kahler Corp. v. Commissioner*, 486 F.2d 1 (8th Cir. 1973), revg. 58 T.C. 496 (1972). While the above cases involved loans between related parties, rather than sales between related parties, the problem presented is

appropriate allocations between the seller and the buyer to reflect an arm's length price for such sale or disposition. An arm's length price is the price that an unrelated party would have paid under the same circumstances for the property involved in the controlled sale. Since unrelated parties normally sell products at a profit, an arm's length price normally involves a profit to the seller.

virtually identical; i.e., whether the Commissioner is author-ized under section 482 to allocate income in respect of a transaction between related entities regardless of whether income is actually realized within the controlled group as a result of such transaction. The Fifth Circuit, to which an appeal in this case would lie, has held that the Commissioner has such authority. *Fitzgerald Motor Co. v. Commissioner, supra*. We think *Fitzgerald* sufficiently in point and we will accordingly follow that precedent. *Jack E. Golsen*, 54 T.C. 742 (1970), affd. 445 F.2d 985 (1971), cert. denied 404 U.S. 940 (1971).

Even under respondent's theory, however, he is only authorized to make an allocation as will reflect an arm's-length price for the equipment sold by the partnership to the corporation. Respondent determined that the manufacturer's list price was such an arm's-length price. After a complete review of the record, we are convinced that in so doing respondent acted arbitrarily and unreasonably. Contrary to respondent's assertion, we believe the testimony of peti-tioners' witnesses, and even that of respondent's witness, establishes that equipment dealers rarely, if ever, received the manufacturer's list price for the type of equipment sold by the partnership to the corporation.

Since respondent's determination of an arm's-length price is in error, the duty rests with the Court to find an arm's-length price. In so doing we must use our best judgment in light of all the evidence. *American Terrazzo Strip Co.*, 56 T.C. 961, 973 (1971). *Nat. Harrison Associates, Inc.*, 42 T.C. 601, 617–618 (1964); *Pauline W. Ach, supra* at 126–127. In this regard, we are given considerable guidance in respondent's regulations.

In situations involving sales of tangible property between members of the same controlled group, three specific methods are provided by the regulations for determining an arm's-length price: the comparable uncontrolled price method, the resale price method, and the cost-plus method. See sec. 1.482–2(e)(1)(ii), Income Tax Regs. If comparable uncontrolled sales exist, the comparable uncontrolled price method must be used since it is the method likely to result in the most accurate estimate of an arm's-length price. If such sales do not exist, the resale price method must be used, if applicable, since it is considered more desirable than the cost-plus method. Finally,

if the resale price method is not applicable, the cost-plus method must be used. If none of the three methods can reasonably be applied, some other appropriate method may be used. Sec. 1.482–2(e)(1)(iii), Income Tax Regs.

Under the comparable uncontrolled price method, an arm's-length price is equal to the price which would be paid in a comparable uncontrolled sale. Uncontrolled sales are sales in which the buyer and seller are not members of the same controlled group. Uncontrolled sales are comparable to controlled sales only if the physical property and circumstances involved in the uncontrolled sales are identical to the physical property and circumstances involved in the controlled sales or if such property and circumstances are so nearly identical that the effect of any differences can be reflected by a reasonable number of adjustments to the price in uncontrolled sales. See sec. 1.482–2(e)(2)(i) and (ii), Income Tax Regs. Both parties agree that there is not sufficient data regarding identical uncontrolled sales to fairly apply this method of determining an arm's-length price. While the evidence regarding sales by other equipment dealers establishes that the manufacturer's list price is not a fair indication of an arm's-length price, such evidence is not sufficiently specific to demonstrate the price which would be paid for each item of identical equipment under identical circumstances by an unrelated party. Nor do we have any indication of what adjustments would be necessary to reflect the differing property and circumstances.

Since the corporation did not resell the equipment, the resale method is obviously not applicable. The third method is the cost-plus method. Under this method, an arm's-length price is determined by adding to the seller's cost of producing property the gross profit percentage (profit expressed as a percentage of cost) earned on the uncontrolled sale or sales of property *most similar* to the controlled sales in question. Sec. 1.482–2(e)(4)(i) and (iii), Income Tax Regs. The term "cost of producing" includes the cost of acquiring property which is held for resale. Sec. 1.482–2(e)(4)(ii), Income Tax Regs. Whenever possible, gross profit percentages should be derived from uncontrolled sales made by the seller involved in the controlled sale, because similar characteristics are most likely to be found among sales by the same seller than among sales

made by other sellers. Sec. 1.482–2(e)(4)(iv), Income Tax Regs. In determining the similarity of the uncontrolled sale or sales, the regulations indicate the following characteristics should be considered:

(a) The type of property involved in the sales. For example: machine tools, men's furnishings, small household appliances.

(b) The functions performed by the seller with respect to the property sold. For example: contract manufacturing, product assembly, selling activity, processing, servicing, delivering.

(c) The effect of any intangible property used by the seller in connection with the property sold. For example: patents, trademarks, trade names.

(d) The geographic market in which the functions are performed by the seller.

In general, the similarity to be sought relates to the probable effect upon the margin of gross profit of any differences in such characteristics between the uncontrolled sales and the controlled sale. Thus, close physical similarity of the property involved in the sales compared is not required under the cost plus method since a lack of close physical similarity is not necessarily indicative of dissimilar profit margins. See subparagraph (2)(iv) of this paragraph, relating to sales made at less than a normal profit for the primary purpose of establishing or maintaining a market. [Sec. 1.482–2(e)(4)(iii), Income Tax Regs.]

During the years in issue the partnership sold one item of new construction equipment to an unrelated entity. The gross profit percentage realized from this sale was 14 percent. There has been no suggestion by respondent that this sale was not the result of an arm's-length negotiation. Since this was a sale of the same type of property, by the same seller, in the same geographic market, we feel it is the most similar sale to the controlled sales in question. In our opinion, an application of the gross profit percentage realized from this uncontrolled sale to the partnership's cost in the property sold in the controlled sales, will result in an accurate reflection of an arm's-length price.

Respondent contends that since his use of manufacturer's list price results in a lower *overall* gross profit percentage than was maintained by the industry in general, his determination is reasonable and justified. In making this contention respondent represents that the use of manufacturer's list price results in a gross profit percentage for the partnership of 13.1 percent and that the average gross profit percentage in the industry was 20 percent.

We have several problems with respondent's position. First, we are not satisfied that the average gross profit percentage in the industry was 20 percent. That figure is derived from a survey conducted by a trade organization, but it has not been established that the survey accurately reflected an "average" for the industry. There is no indication of how many dealers or what percentage of all dealers participated in the survey. Secondly, there is nothing to suggest that sales by the equipment dealers who did participate were comparable to sales by the partnership. Finally, we believe that the gross profit percentage realized in a sale by *this* partnership to an unrelated party is a much more reliable indicator of the profit the partnership would have realized in an arm's-length sale to the corporation than is an industry average.

Furthermore, respondent's representation that his use of manufacturer's list price results in a gross profit percentage of 13.1 percent is misleading. That figure represents the gross profit percentage when all sales by the partnership are taken into account. Actually, respondent's determination results in a much higher gross profit percentage for the sales in issue, as is illustrated below:

SALES OF NEW EQUIPMENT BY PARTNERSHIP TO CORPORATION

| Item | Year of sale | Partnership's cost | Manufacturer's list price | Gross profit | Gross profit percentage |
|---|---|---|---|---|---|
| Trackmaster crawler tractor and trailer | 1968 | $5,058.75 | $6,675.00 | $1,616.25 | 32 |
| P. & H. R-125 crane | 1969 | 32,373.60 | 41,125.00 | 8,751.40 | 27 |
| P. & H. H-418T crane | 1969 | 59,888.52 | 70,637.05 | 10,748.53 | 18 |
| P. & H. 325 TCWA crane | 1970 | 55,151.81 | 67,588.00 | 12,436.19 | 23 |
| P. & H. 325 TCWA crane | 1970 | 52,534.90 | 64,381.00 | 11,846.10 | 23 |
| P. & H. 320 crane | 1970 | 33,509.38 | 43,632.00 | 10,122.62 | 30 |

Respondent has clearly failed in his attempt to demonstrate that his determination compares favorably to the cost-plus method. Under that method, an arm's-length price is determined by using the gross profit percentage for the most comparable uncontrolled sale. The focus is not, as suggested by respondent, on determining an acceptable or reasonable

overall gross profit percentage, but is on determining an arm's-length price for the sale or sales in question by using the gross profit percentage established in an uncontrolled sale.

## Issue 2. Depreciation Deductions

Respondent recomputed the amount of depreciation allowable for 1969 and 1970 with respect to 13 items of equipment used by the corporation in its business. Respondent disallowed 30 percent of the depreciation claimed with respect to a Piper Aztec airplane, based on his determination that the airplane was used 30 percent of the time on nonbusiness flights. Since petitioner introduced no evidence to overcome respondent's determination of nonbusiness use, we must uphold respondent's determination as to this item. Rule 142(a), Tax Court Rules of Practice and Procedure.

The remainder of the depreciation disallowed by respondent was with respect to items of heavy construction equipment. Petitioner claimed depreciation with respect to these items, using the double declining balance method, based on a useful life of 8 years. Petitioner did not take salvage value into account in claiming depreciation on these items. Based on petitioner's past experience, respondent determined that the useful life to the corporation for the construction equipment was 5 years and that it had a salvage value equal to 80 percent of its original cost. After making the adjustment to salvage value, provided for in section 167(f), respondent recomputed the amount of allowable depreciation. For the most part the depreciation disallowed was due to the fact that the equipment had already been depreciated below salvage value (as determined by respondent) in prior years.

Under section 167(a) and the regulations thereunder, the estimated useful life of an asset is not necessarily the useful life inherent in the asset, but is the period over which the asset may reasonably be expected to be useful to the taxpayer in its trade or business. See *Massey Motors v. United States,* 364 U.S. 92 (1960); *Hertz Corp. v. United States,* 364 U.S. 122 (1960). This period is determined by reference to the taxpayer's experience with similar property, taking into account present conditions and probable future developments.

Some of the factors to be considered in determining this period are:

(1) Wear and tear and decay or decline from natural causes;

(2) The normal progress of the art, economic changes, inventions, and current developments within the industry and the taxpayer's trade or business;

(3) The climatic and other local conditions peculiar to the taxpayer's trade or business; and

(4) The taxpayer's policy as to repairs, renewals, and replacements. Sec. 1.167(a)–1(b), Income Tax Regs.

Petitioner's argument is that its estimate of an 8-year useful life was reasonable when made. However, petitioner has given us no hint of how it reached that estimate. Moreover, all of the evidence is contrary to petitioner's position. The corporation had been in the heavy construction business since 1959 or 1960. The testimony by one corporate official was that the normal holding period, for this corporation, for this type of equipment during the 1960's was 5 years or less. The only specific data, regarding the period of time construction equipment was used by the corporation, is with respect to equipment disposed of between August 1968 and August 1970. That schedule, which is set out in our findings, indicates an average period of use of less than 5 years. Four of the items in that schedule were disposed of prior to the end of the first year here in issue. It is apparent that the information available to petitioner during the years in issue indicated that its construction equipment would be useful in its business for not longer than 5 years. We uphold respondent's determination of useful life.

In claiming depreciation, petitioner did not take salvage value into account. Petitioner's accountant testified that a determination of salvage value was not necessary, since petitioner was using the double declining balance method. While salvage value is not a factor in computing annual deductions under that method, it is clear that an asset may not be depreciated below its estimated salvage value, regardless of the method of depreciation used. Secs. 1.167(a)–1(a) and (c), and 1.167(b)–2(a), Income Tax Regs.

Salvage value is the estimated amount realizable upon sale or other disposition of an asset when it is no longer useful in the taxpayer's trade or business. The time at which an asset is

retired from service may vary according to the policy of the taxpayer. If the taxpayer's policy is to dispose of assets which are still in good operating condition, the salvage value may represent a relatively large proportion of the original basis of the asset. Sec. 1.167(a)–1(c), Income Tax Regs.

Respondent's determination of salvage value is based upon the percentage of cost recovered by the corporation on the equipment which it traded in between August 1968 and August 1970. Over half of the trade-ins during that period occurred prior to the end of the first year here in issue. The percentage of cost recovered in those trade-ins ranged from 76 percent to 103 percent. We think respondent's determination, based upon information regarding petitioner's actual experience, is reasonable. Furthermore, most of the information relied upon by respondent was available to petitioner at the time deductions were claimed, and respondent's determination does not involve a change in salvage value merely because of subsequent changes in price levels.

Petitioner's argument that the determination of salvage value should be based upon the percentage of list price recovered and not upon the percentage of cost recovered misses the point. This argument is based upon respondent's use of list price in allocating income. However, respondent has conceded that to the extent income is allocated to the partnership in respect of sales to the corporation, a correlative adjustment will be necessary to the income of the corporation by increasing its depreciable basis in the equipment. See sec. 1.482–1(d)(2), Income Tax Regs.

*Decisions will be entered under Rule 155.*